Keene District Court
No. 2004-189

ROBERT MATTE & a.

v.

SHIPPEE AUTO, INC.

Argued: November 30, 2004
Opinion Issued: May 20, 2005

*Bell & Hockensmith*, of Keene (*G. Jeremy Hockensmith* on the brief and orally), for the plaintiffs.

*Law Office of Steve J. Bonnette, P.C.*, of Keene (*Steve J. Bonnette* on the brief and orally), for the defendant.

NADEAU, J. The plaintiffs, Robert Matte and Bob Matte's Raceway Motors, Inc., appeal an order of the Keene District Court (*Talbot*, J.) permitting an offset for damages against any unpaid rent by the defendant, Shippee Auto Inc., in this action to evict it from premises leased from the plaintiffs. We reverse and remand.

The record supports the following facts. The defendant leases space in a commercial building shared by it and the plaintiffs. The lease requires the defendant to pay a fixed rent of $2,000 per month, plus a portion of real estate tax increases as additional rent. Evidence was presented at trial that the roof has leaked periodically since the defendant has been in the building. The leaking became steadily worse during the summer of 2003. In December 2003, the defendant began withholding rent, stating through counsel that it would continue to do so until it "stop[ped] raining into [its] space." At the time of trial, the defendant was also behind on the additional tax rent. The defendant represented at trial that the rent due had been placed in an escrow account.

The plaintiffs brought this action under RSA chapter 540 to evict the defendant from the premises. The trial court held that a tenant could not avoid a landlord-tenant action by withholding rent for claimed breaches of warranty. On the other hand, it noted, a residential tenant may claim offsets against unpaid rent for breaches of the warranty of habitability. The court concluded: "As a matter of contract law, by analogy, a commercial tenant should therefore be permitted to offset its damages against any unpaid rent."

The court found that the plaintiffs were entitled to the unpaid rent and taxes. It determined, however, that the defendant was "entitled to a credit of $2,000 rent for the month of December when the premises were of little use for substantial periods of time; $500 for having to heat the premises in January without the benefit of insulation; and $2700 for the repair of" a water-damaged piece of equipment. The court concluded that if the defendant paid the remaining balance of unpaid rent and taxes by February 25, 2004, the court would dismiss the eviction action.

On appeal, the plaintiffs argue that the trial court lacked the authority to deny the eviction sought and to order the affirmative relief it did. They note that an eviction proceeding under RSA chapter 540 is a summary possessory action, and argue that the trial court's authority to grant relief is limited to that prescribed by the statute. They also note that their writ sought only possession—they made no claim for past-due rent and the defendant filed no counterclaims.

Before adoption of the statutory procedures codified in RSA chapter 540, the usual way a landlord regained possession of property was by a common law ejectment action. *Lavoie v. Szumiez*, 115 N.H. 266, 267 (1975).

> In order to simplify and facilitate the landlord's recovery of possession of his premises, statutory summary possessory actions which lie in ... district courts were authorized. Such a statute is not to be construed as making any change in the

possessory nature of the action unless such an intention is clearly indicated by its terms. Since these statutes establish rights and benefits which a landlord did not enjoy at common law, strict compliance with their terms is required.

*Id.* (citation omitted). Furthermore, as the Supreme Court of Connecticut has explained:

The purpose of summary process proceedings is to permit the landlord to recover possession on termination of a lease without suffering the delay, loss and expense to which he may be subjected under a common-law action. The process is intended to be summary and is designed to provide an expeditious remedy to the landlord seeking possession.

*Ossen v. Wanat,* 585 A.2d 685, 687 (Conn.) (quotation and ellipses omitted), *cert. denied,* 502 U.S. 816 (1991). Accordingly, the District of Columbia Court of Appeals has stated that "[f]ew defenses are available in [summary] possessory actions." *Brown v. Young,* 364 A.2d 1171, 1173 (D.C. 1976).

With these guidelines in mind, we examine our own summary possessory action statute. In matters of statutory interpretation, we are "the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." *Remington Invs. v. Howard,* 150 N.H. 653, 654 (2004). "Where the language of a statute is clear on its face, its meaning is not subject to modification. We will neither consider what the legislature might have said nor add words that it did not see fit to include." *Id.* (citation omitted).

RSA 540:13, III (Supp. 2004) provides, in part:

The writ of summons shall provide an opportunity for the landlord, at the landlord's option, to make a claim for an award of unpaid rent. If the landlord elects to make a claim for unpaid rent, the court shall consider any defense, claim, or counterclaim by the tenant which offsets or reduces the amount owed to the plaintiff. If the court finds that the landlord is entitled to possession on the ground of nonpayment of rent, it shall also award the landlord a money judgment. If the court determines that the amount owed by the landlord to the tenant, as a result of set-off or counterclaim exceeds or equals the amount of rent and other lawful charges owed by the tenant to the landlord, judgment in the possessory action shall be granted in favor of the tenant. If the court finds that the tenant's counterclaim exceeds

the amount of the nonpayment, a money judgment shall issue in favor of the tenant.

■ The plain meaning of this provision is that the type of defense the defendant sought to assert here, namely, one "which offsets or reduces the amount owed to the plaintiff[s]," is available only "[i]f the landlord elects to make a claim for unpaid rent." *Id.* The landlord here did not so elect, but rather sought possession of the premises only. Thus, the trial court erred in offsetting the defendant's damages against the past-due rent and in ruling that the defendant could avoid eviction by paying the net amount of rent owed. Accordingly, we reverse the trial court's order.

■ Certain defenses are recognized in RSA chapter 540 itself, and those defenses are of course cognizable in a summary proceeding brought under that statute. For instance, RSA 540:13-d (1997) provides a defense to a possessory action brought for failure to pay rent for a substantial violation of "standards of fitness for health and safety" that "materially affects the habitability of [the] premises." The defendant argues that the trial court had the authority to order relief under this section. We disagree. By its terms, RSA 540:13-d applies only to "any premises leased or rented for residential purposes, other than for vacation or recreation." It therefore does not apply to this commercial lease.

The defendant argues that the trial court, nevertheless, correctly extended the warranty of habitability to this commercial lease "by analogy to contract law." The defendant acknowledges that we declined to extend the warranty of habitability to commercial leases in *Golub v. Colby*, 120 N.H. 535, 536 (1980), but notes that we expressly based our decision on the facts of that case, which were substantially different from those presented here.

■ We need not reconsider whether to extend the warranty of habitability to commercial leases because *Kline v. Burns*, 111 N.H. 87, 92 (1971), the decision in which we first recognized an implied warranty of habitability in residential leases, does not support the proposition the defendant would have us apply, namely, that breach of the warranty of habitability allows a tenant to withhold rent and defeat an eviction action. That remedy, as noted previously, was made available to residential tenants by statute and does not apply to commercial tenants. *See* RSA 540:13-d. In *Kline*, the landlord had already recovered possession of the premises and that judgment was not at issue on appeal. *Kline*, 111 N.H. at 88. We stated that "[a]doption of [the implied warranty of habitability] makes available to the tenant the basic contract remedies of damages, reformation, and rescission. The tenant can obtain relief by instituting an

action for breach of warranty or by offsetting his damages against a claim made against him by the landlord." *Id.* at 93 (citation omitted). Thus, we decline to address the defendant's warranty of habitability argument.

The defendant appears to argue, however, for adoption of the rule that lease covenants are mutually dependent, and cites case law from other jurisdictions holding that view. Under this theory, the tenant's obligation to pay rent would be dependent upon the landlord's performance of some or all of the landlord's obligations under the lease. Thus, for example, the Utah Supreme Court has held that "the lessee's covenant to pay rent is dependent on the lessor's performance of covenants that were a significant inducement to the consummation of the lease or to the purpose for which the lessee entered into the lease." *Richard Barton Enterprises, Inc. v. Tsern*, 928 P.2d 368, 378 (Utah 1996).

The doctrine that the defendant would have us adopt is contrary to the common law rule that the covenants of a lease are independent, and only an actual or constructive eviction will relieve a tenant of his obligation to pay rent. *See Wesson v. Leone Enterprises, Inc.*, 774 N.E.2d 611, 620 (Mass. 2002). We noted the independent covenants rule in *Kline*, 111 N.H. at 91, and while we recognized therein an implied warranty of habitability in residential leases, *see id.* at 92, we did not adopt the tenants' contention that "the duty to comply with the [housing] code was a contractual obligation of the landlords to the tenants and that their obligation to pay rent was dependent on the landlords' performance of their obligation," *id.* at 90. Rather, we noted the common law rule that "[t]he landlord's breach of an express covenant to repair does not excuse, nor is it a defense to, the failure of the tenant to pay rent," *id.*, and the remedies afforded tenants by our adoption of the warranty of habitability in that case do not vitiate that rule.

As we observed in *Kline*, however, the common law doctrine of independent lease covenants originated under the system of feudal tenure, which has little application in the modern world. *See Kline*, 111 N.H. at 90-92.

> Under the tenurial system a lease was considered primarily as a conveyance of lands for a certain term or at will. The tenant was considered both an owner and occupier in order to provide him with the remedies with which to protect his interest against the landlord and others. Furthermore, in the agrarian society then existing, the value of the lease to the tenant was the land itself which would often yield the rent. Also the buildings on the land were mostly incidental to the lease. They were constructed simply without modern conveniences and could be easily kept in

> repair by the tenant. Because the lease was primarily a conveyance of land, the covenants of the parties were considered to be mutually independent of each other.

*Id.* at 90-91 (citations omitted).

As a number of courts have recognized, many of the historical underpinnings of the independent covenants rule have given way to changes in society and the law. "With the evolution from an agrarian to an urbanized, industrialized society, improvements on the land became relatively more important. Improvements such as houses, apartments, office[s,] . . . commercial buildings, . . . plants and factories came to have greater value to the lessee than did the land itself." *Richard Barton Enterprises*, 928 P.2d at 375. The typical tenant has also evolved from the "'jack-of-all-trades' farmer who was the common law's model of the lessee" to one who lacks the skill, ability or incentive to make repairs himself. *Wesson*, 774 N.E.2d at 619 (quotation omitted).

In addition, leases have come to be viewed by many courts as more properly analyzed under contract law rather than property law. *See, e.g., Teodori v. Werner*, 415 A.2d 31, 33 (Pa. 1980). Thus, it has been noted that the independent covenants rule "may be shifting somewhat due to the increasing influence of contract law on interpretation of leases." *South Forks Shopping Ctr. v. Dastmalchi*, 446 N.W.2d 440, 443 (N.D. 1989). For many of the foregoing reasons, courts in a number of States have adopted the view, even in the context of commercial leases, that the tenant's and the landlord's covenants are dependent. *See Terry v. Gaslight Square Associates*, 897 P.2d 667, 672 (Ariz. Ct. App. 1994); *Wesson*, 774 N.E.2d at 621; *Teodori*, 415 A.2d at 34; *Richard Barton Enterprises*, 928 P.2d at 378.

In *Kline*, our recognition that feudal values no longer define or influence the landlord-tenant relationship in modern society prompted us to abandon the common law rule that ordinary leases contain no implied warranty that "the premises are reasonably safe or suitable for the uses intended." *Kline*, 111 N.H. at 89 (quotation omitted). Nevertheless, while that recognition has not escaped us here, a number of considerations convince us not to abandon the common law rule of independent covenants at this time.

First, although the independent covenants rule is a part of the common law, some areas of landlord-tenant law are now governed by legislatively-enacted rules and procedures. *See* RSA ch. 540 (1997 & Supp. 2004); RSA ch. 540-A (1997 & Supp. 2004). Admittedly, RSA 540:26 (1997) provides that "[n]othing in this chapter shall be construed to prevent a landlord from pursuing his legal remedy at common law," and, therefore, "in New Hampshire, the old common-law actions of ejectment and entry have been

retained and exist side by side with the statutory remedy, at the election of the suitor." *Cooperman v. MacNeil*, 123 N.H. 696, 701 (1983). Nevertheless, we can envision ways in which changing common law rights and remedies might disrupt the legislatively-created framework governing RSA chapter 540 actions. Thus, we are reluctant to make such changes without first giving the legislature an opportunity to address the issue.

Similarly, wholesale abrogation of the independent covenants rule may affect other common law doctrines in ways that have not been brought to our attention by the parties because they are not relevant to the case before us. We note, for instance, that we recently reaffirmed the independent covenants rule in *RAL Automotive Group, Inc. v. Edwards*, 151 N.H. 497, 500 (2004), in the context of allowing a landlord to mitigate damages by repossessing and reletting the premises without losing the right to seek damages from the original tenant for any deficiency in the rent. The effect that abandoning the independent covenants rule in this case might have on the mitigation of damages doctrine is neither clear nor currently before us. The legislature, on the other hand, may consider the global effects of any change it may make in the framework of the statutory possessory action.

Finally, "considerations in favor of *stare decisis*" are paramount "in cases involving contract rights, where reliance interests are involved." *Providence Mut. Fire Ins. Co. v. Scanlon*, 138 N.H. 301, 304 (1994) (quotation and ellipsis omitted). A sudden and fundamental change in the law such as that proposed by the defendant would seriously disrupt settled expectations among landlords and tenants in this State. A statutory change, on the other hand, would give landlords and tenants more of an opportunity to anticipate and adjust to the new law.

Accordingly, we decline at this time the defendant's invitation to adopt the doctrine of dependent lease covenants. We turn now to the defendant's remaining arguments.

The defendant contends that "[t]he parties modified the terms of the lease to provide that once the roof was completely repaired, [the defendant] would pay all rent that it owed, including its portion of the real estate tax bill." The plaintiffs counter that this argument was not preserved for appellate review, and that, in any event, the evidence does not show a modification of the lease. Upon review of the record, we conclude that even if this issue had been preserved, the evidence would not support a finding of modification. There appears to have been, at most, an agreement sometime prior to November 5, 2003, "to defer discussions regarding the unpaid real estate tax rent until the roof has been repaired." There is no evidence that this agreement authorized the defendant to begin withholding the fixed monthly rent in December.

■ Finally, the defendant argues that "it was proper for the trial court to deny the eviction based on principles of equity." We disagree. "[T]he district court is not a constitutional court and does not have a general grant of equitable power." *Emerson v. Town of Stratford*, 139 N.H. 629, 631 (1995). It "is a court of limited jurisdiction with powers conferred by statute." *Woodstock Soapstone Co. v. Carleton*, 133 N.H. 809, 816 (1991); *see* RSA 502-A:14 (1997). "Although it has the power to entertain possessory actions under RSA 540:13, the district court does not have equity jurisdiction." *Woodstock Soapstone*, 133 N.H. at 816. Accordingly, we reject the defendant's argument.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.